UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------

GROUP ONE LTD.,

                         Plaintiff,

            v.

GTE GmbH and RALPH WEIGEL, *in his
corporate capacity as owner of GTE and in his
individual capacity*,

                         Defendants.

----------------------------------------------------------------

**MEMORANDUM & ORDER**

20-CV-2205 (MKB)

MARGO K. BRODIE, United States District Judge:

> Plaintiff Group One Ltd. ("Group One") commenced the above-captioned action on May 15, 2020, against Defendants GTE GmbH ("GTE") and Ralf Weigel, and filed an Amended Complaint on April 16, 2021, alleging that Defendants infringed Plaintiff's patents for tennis let-detection systems and knowingly spread malicious falsehoods about the capabilities of Plaintiff's systems. (*See generally* Compl., Docket Entry No. 1; Am. Compl., Docket Entry No. 39.) On September 2, 2022, the Court (1) granted Plaintiff a default judgment with respect to Plaintiff's claims of (a) patent infringement under the Patent Act, (b) tortious interference with prospective business relations under New York common law, (c) unfair competition under the New York common law, and (d) false advertising claims under the Lanham Act; (2) denied Plaintiff's request for a default judgment with respect to Plaintiff's claims of (a) deceptive trade practices and false advertising under the New York General Business Law ("GBL") and (b) trade libel under the New York common law; (3) granted Plaintiff's request for a permanent injunction; and (4) deferred ruling on Plaintiff's requests for damages (the "September 2022 Decision"). (Sept. 2022 Decision, Docket Entry No. 108.)

The Court now considers (1) Plaintiff's motion for damages and (2) Plaintiff's motion to modify the permanent injunction.  For the reasons discussed below, the Court grants Plaintiff's motion for damages and denies Plaintiff's motion to modify the permanent injunction.

## I.   Background

Plaintiff commenced the above-captioned action on May 15, 2020, and filed an Amended Complaint on April 16, 2021, alleging that Defendants infringed Plaintiff's patents for tennis let-detection systems and knowingly spread malicious falsehoods about the capabilities of Plaintiff's systems.  (*See generally* Compl.; Am. Compl.)  Plaintiff brings claims of direct, induced, and contributory patent infringement under the Patent Act, 35 U.S.C. § 271(a)–(c); false advertising and use of false descriptions and false representations under section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); tortious interference with prospective business relations and unfair competition under the New York common law; deceptive trade practices and false advertising under sections 349(h) and 350(e)(3) of the GBL, respectively; and trade libel under the New York common law. (Am. Compl. ¶¶ 51–155.)  Defendants initially appeared in the action but subsequently defaulted, and the Clerk of Court entered default against them on June 30, 2021.  (Clerk's Entry of Default, Docket Entry No. 46.)  On July 9, 2021, Plaintiff moved for a default judgment, (Pl.'s Mot. for Default J., Docket Entry Nos. 47–48), and, on July 10, 2021, the Court referred Plaintiff's motion to Magistrate Judge James R. Cho for a report and recommendation, (Order dated July 10, 2021).

### a.   Report and recommendation

By report and recommendation dated February 28, 2022, Judge Cho recommended that the Court (1) deny Plaintiff's motion as to the claims of patent infringement, deceptive trade practices and false advertising under GBL §§ 349 and 350, and trade libel under the New York

common law; (2) grant Plaintiff's motion as to the claims of false advertising and use of false descriptions and false representations under the Lanham Act and tortious interference with prospective business relations and unfair competition under the New York common law; and (3) deny without prejudice Plaintiff's requests for a permanent injunction and patent infringement damages, and for an award of lost profits in connection with its non-patent claims (the "R&R").  (R&R 32, 36–37, Docket Entry No. 92.)  With regard to remedies, Judge Cho recommended that the Court deny Plaintiff's requests for damages "[u]ntil such time as [P]laintiff can provide the requisite proof to establish the necessary facts demonstrating that [its] patents preceded [D]efendants' products and stop-clock control functionality."  (*Id.* at 32.)  As to non-patent damages, Judge Cho recommended that Plaintiff's request for damages should be assessed under the Lanham Act instead of New York common law.  (*Id.* at 33.)

### b.   The Court's September 2022 Decision

On September 2, 2022, the Court adopted the R&R in part and (1) granted Plaintiff's default judgment motion with respect to Plaintiff's claims of patent infringement under the Patent Act, tortious interference with prospective business relations and unfair competition under the New York common law, and false advertising claims under the Lanham Act; (2) denied default judgment with respect to Plaintiff's deceptive trade practices and false advertising claims under the GBL and claim of trade libel under the New York common law; (3) granted Plaintiff's request for a permanent injunction; and (4) deferred ruling on Plaintiff's request for damages (Sept. 2022 Decision.)

### c.   Motion for damages

In the September 2022 Decision, the Court concluded that Plaintiff was entitled to injunctive relief because Plaintiff was successful on the merits, suffered an irreparable injury and

remedies available at law were inadequate to compensate Plaintiff, and the balance of hardships favored Plaintiff.  (*Id.* at 57–61.)  However, the Court was unable to determine Plaintiff's lost profits or reasonable royalties based on its patent claims "[b]ecause Plaintiff did not provide evidence of its fixed costs" or "evidence to support an award of reasonable royalties."  (*Id.* at 66–67.)  As to Plaintiff's non-patent claims,[1] the Court found that "Plaintiff has not provided all of the information necessary to allow the Court to calculate Plaintiff's lost profits."  (*Id.* at 73.)  Plaintiff did not provide the costs it would incur in generating revenue, such as production costs, shipping charges, and setup costs, therefore the Court could not calculate Plaintiff's lost profits.  (*Id.*)  The Court denied without prejudice Plaintiff's request for non-patent lost profits.  (*Id.*)  The Court ultimately deferred ruling on Plaintiff's requests for damages and granted Plaintiff thirty days to provide additional evidence in support of its damages requests.  (*Id.* at 73–74.)

On October 21, 2022, Plaintiff filed its damages submission with a motion for leave to file documents under seal.  (Pl.'s Mot. to Seal, Docket Entry No. 120; Pl.'s Mem. in Supp. of Mot. to Seal, Docket Entry No. 120-1; Pl.'s Mem. in Supp. of Pl.'s Damages Submission ("Pl.'s Damages Mem."), Docket Entry No. 120-3.)  As part of its damages submission, Plaintiff submitted a declaration from its Director of Intellectual Property, Fredric Goldstein.  (Decl. of Fredric Goldstein in Supp. of Damages ("Goldstein Decl.") ¶ 1, Docket Entry No. 120-4.)

**d.   Motion to modify the permanent injunction**

On September 14, 2022, the Court held a status conference to discuss issues relating to the language of Plaintiff's proposed permanent injunction.  (Minute Entry dated Sept. 14, 2022.)  On that same day, the Court entered the permanent injunction.  (Order and Permanent Injunction,

---

[1]  The Court found that Judge Cho properly analyzed lost profits under the Lanham Act rather than New York common law.  (*Id.* at 67–68.)

Docket Entry No. 113.)

On March 14, 2023, Plaintiff moved to modify the permanent injunction, (Notice of Pl.'s Mot. to Modify Permanent Inj., Docket Entry No. 126), arguing that a significant change in circumstances warrants modification, the proposed revision is a reversion to a narrower injunction, and that past misconduct also justifies a reversion to the original proposed language (Pl.'s Mem. in Supp. of Pl.'s Mot. to Modify Permanent Inj. ("Pl.'s Inj. Mem."), Docket Entry No. 126-1.)  Non-party United States Tennis Association, Inc. ("USTA") filed a letter response on March 28, 2023 arguing against a modification of the permanent injunction.  (Letter in Resp. to Pl.'s Mot. ("USTA Opp'n"), Docket Entry No. 127.)

**e.    Motion for prejudgment attachment**

On October 7, 2022, Plaintiff filed a motion for pre-judgment attachment pursuant to Rule 64 of the Federal Rules of Civil Procedure requesting that Plaintiff be permitted to "attach a sum of money in the form of an account payable, equal to the amount sought in this action, about to be paid by the [USTA] to Defendants GTE GmbH and Ralf Weigel as service fees for the use of the Trinity® let detection system at the recently concluded 2022 U.S. Open and any other relief that is just."  (Pl.'s Mot. for Pre-Judgment Attachment, Docket Entry No. 118.)  The Court referred that motion to Magistrate Judge James R. Cho for another report and recommendation. (Order dated Oct. 14, 2022.)

**f.    Additional procedural history**

While the R&R dated February 28, 2022 was pending, on August 18, 2021, Plaintiff moved *ex parte* for an order to show cause for a temporary restraining order and preliminary injunction on the grounds that Defendants were "making, using, importing, distributing, offering for sale, and selling let detection systems that infringe two patents owned by Group One."  (Pl.'s

Mot. for Order to Show Cause for Prelim. Inj. and TRO, Docket Entry No. 51.)  On August 23,

2021, the Court issued a temporary restraining order.  (Aug. 2023 Decision, Docket Entry No.

55; TRO, Docket Entry No. 55-1.)  On August 30, 2021, Plaintiff filed an emergency motion to

enforce the TRO to "restrain the [USTA] from its continued use of the Trinity let detection

system at the 2021 U.S. Open tennis tournament."  (Pl.'s Emergency Mot. to Enforce TRO,

Docket Entry No. 58.)  The next day, on August 31, 2021, the Court ordered USTA to "show

cause in writing by September 2, 2021, why the Court should not hold the USTA in contempt for

failing to comply with the Court's TRO."  (Order to Show Cause 4–5, Docket Entry No. 61.)

USTA responded on September 2, 2021, (Non-Party USTA Resp. to Order to Show Cause,

Docket Entry No. 65), and Plaintiff responded on September 6, 2021 (Pl.'s Resp. to USTA's

Resp. to Order to Show Cause, Docket Entry No. 66).

On September 9, 2021, the Court held a hearing regarding the preliminary injunction and

Plaintiff's motion to hold USTA in contempt of the Court's TRO (the "September 2021

hearing").  (Minute Entry dated Sept. 9, 2021.)  The Court denied Plaintiff's motion to hold

USTA in contempt, denied Plaintiff's motion to enforce the TRO against USTA, and deferred

ruling on Plaintiff's request for a preliminary injunction in view of Defendant's nonappearance

(the "September 9, 2021 Order").  (*Id.*)

On December 23, 2021, Plaintiff moved for reconsideration of the Court's September 9,

2021 Order denying the motion for contempt and motion to enforce the TRO against USTA,

(Pl.'s Mot. for Recons. Pursuant to Rule 60(b)(1) ("Pl.'s 60(b)(1) Mot. for Recons."), Docket

Entry No. 81), and then again moved for reconsideration on December 27, 2021, (Pl.'s Mot. for

Recons. Pursuant to Rule 60(b)(3) ("Pl.'s 60(b)(3) Mot. for Recons."), Docket Entry No. 83).

USTA responded on January 13, 2022 and January 17, 2022, (Non-Party USTA Resp. in Opp'n

to Pl.'s 60(b)(1) Mot. for Recons., Docket Entry No. 84; Non-Party USTA Resp. in Opp'n to Pl.'s 60(b)(3) Mot. for Recons., Docket Entry No. 85.), and Plaintiff filed replies on January 24, 2022 and January 28, 2022, (Pl.'s Reply in Further Supp. of Pl.'s 60(b)(1) Mot. for Recons., Docket Entry No. 87; Pl.'s Reply in Further Supp. of Pl.'s 60(b)(3) Mot. for Recons., Docket Entry No. 88).  USTA filed a sur-reply to both of Plaintiff's replies on February 4, 2022, (Non-Party USTA Sur-Reply in Further Supp. of its Opp'n to Pl.'s Mots. For Recons., Docket Entry No. 89), and filed a letter motion to strike a late-attached exhibit by Plaintiff on February 11, 2022, (Non-Party USTA Mot. to Strike, Docket Entry No. 91).  On March 30, 2023, the Court denied Plaintiff's motions for reconsideration and granted the USTA's motion to strike.  (Mar. 2023 Decision, Docket Entry No. 128.)

## II.  Discussion

### a.  Standard of review

Pursuant to Rule 55 of the Federal Rules of Civil Procedure, there is "a 'two-step process' for the entry of judgment against a party who fails to defend: first, the entry of a default, and second, the entry of a default judgment."  *City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 128 (2d Cir. 2011) (quoting *New York v. Green*, 420 F.3d 99, 104 (2d Cir. 2005)).  "[T]he court may, on plaintiffs' motion, enter a default judgment if liability is established as a matter of law when the factual allegations of the complaint are taken as true."  *Bricklayers & Allied Craftworkers Loc. 2 v. Moulton Masonry & Constr., LLC*, 779 F.3d 182, 187 (2d Cir. 2015).  "A default . . . only establishes a defendant's liability if those allegations are sufficient to state a cause of action against the defendant."  *Taizhou Zhongneng Imp. & Exp. Co. v. Koutsobinas*, 509 F. App'x 54, 56 (2d Cir. 2013); *LG Funding, LLC v. Fla. Tilt, Inc.*, No. 15-CV-631, 2015 WL 4390453, at *2 (E.D.N.Y. July 15, 2015) ("To determine whether the default

judgment should issue, the [c]ourt examines whether 'the factual allegations, accepted as true, provide a proper basis for liability and relief.'" (quoting *Rolls-Royce PLC v. Rolls-Royce USA, Inc.*, 688 F. Supp. 2d 150, 153 (E.D.N.Y. 2010))).  However, because there is "'a strong preference for resolving disputes on the merits,' and because 'a default judgment is the most severe sanction which the court may apply,' . . . a district court's discretion in [granting default judgment is] 'circumscribed,'" *Mickalis Pawn Shop, LLC*, 645 F.3d at 129 (first quoting *Green*, 420 F.3d at 104; then quoting *Enron Oil Corp. v. Diakuhara*, 10 F.3d 90, 95 (2d Cir. 1993); and then citing *State St. Bank & Tr. Co. v. Inversiones Errazuriz Limitada*, 374 F.3d 158, 168 (2d Cir. 2004)), and "all doubts must be resolved in favor of the [defaulting] party," *Green*, 420 F.3d at 104.  "Further, concerns regarding the protection of a litigant's rights are heightened when the party held in default appears *pro se*. . . . Hence, as a general rule a district court should grant a default judgment sparingly . . . when the defaulting party is appearing *pro se*." *Enron Oil Corp.*, 10 F.3d at 96.  "The entry of a default, while establishing liability, 'is not an admission of damages.'" *Mickalis Pawn Shop, LLC*, 645 F.3d at 128 (quoting *Finkel v. Romanowicz*, 577 F.3d 79, 83 n.6 (2d Cir. 2009)).  "There must be an evidentiary basis for the damages sought by plaintiff, and a district court may determine there is sufficient evidence either based upon evidence presented at a hearing or upon a review of detailed affidavits and documentary evidence." *Cement & Concrete Workers Dist. Council Welfare Fund v. Metro Found. Contractors, Inc.*, 699 F.3d 230, 234 (2d Cir. 2012) (first citing Fed. R. Civ. P. 55(b)(2); and then citing *Fustok v. ContiCommodity Servs., Inc.*, 873 F.2d 38, 40 (2d Cir. 1989)).

     **b.   Plaintiff's motion for damages**

     Pursuant to the September 2022 Decision, Plaintiff submitted additional evidence in support of its damages requests.  (Pl.'s Damages Mem.; Goldstein Decl.)  Plaintiff submitted a

declaration from its Director of Intellectual Property explaining Plaintiff's revenue and costs associated with providing its product to the Grand Slam tournaments as well as the Defendants' costs.  (Goldstein Decl. ¶¶ 23–46.)  Plaintiff also provided fifteen exhibits in support of its request.  (Exs. A–O, annexed to Goldstein Decl., Docket Entry Nos. 120-5–120-19.)

### i.   Lost profits based on Plaintiff's patent claims

In support of its request for damages due to patent infringement, Plaintiff contends that the correct formula for the Court to use in determining lost profits is revenue less variable costs, instead of fixed costs.  (Pl.'s Damages Mem. 2–3.)  In addition, Plaintiff argues that the patent "infringer's profits can be used as an approximation of [its] lost profits."  (*Id.* at 3.)  In support, Plaintiff argues that the "burden of any uncertainty as to the amount of damages lies with the wrongdoing party."  (*Id.* (citing *Ryco, Inc. v. Ag-Bag Corp.*, 857 F.2d 1418, 1428 (Fed. Cir. 1988)).)  Plaintiff also argues that the patent holder can also recover "enhanced damages" under 35 U.S.C. § 285, where the patent infringement was "willful," and further argues that it would be entitled to attorneys' fees if the Court finds that the infringement is "exceptional."  (*Id.* at 4–5.)

As to the damages calculation, Plaintiff argues that the fees should reflect what Plaintiff would have charged and obtained but for Defendants' infringement.  (*Id.* at 7.)  Plaintiff asserts that it "did not save any variable costs because of the infringements," since its units were already produced and "sat unused."  (*Id.* at 5.)  Plaintiff argues that "there is evidence that [its] lost profits also includes price erosion," because Plaintiff could have charged a premium by capitalizing on the limited monopoly afforded to it under the U.S. patent system.  (*Id.* at 6.)  In support, Plaintiff asserts it could have "charged an additional 15% rather than being forced to underbid Defendants."  (*Id.*)  In addition, Plaintiff argues that the Court "should take into account that the adjudicated patent infringement of past years . . . has led to present day, ongoing

damages" which were "easily foreseeable by Defendants." (*Id.*) Finally, Plaintiff argues that the Court should consider that it has been unable to obtain information regarding what Defendants have charged the USTA at past U.S. Open tournaments. (*Id.* at 6–7.)

The Patent Act provides that "the court shall award [the patent owner] damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer." 35 U.S.C. § 284; *WesternGeco LLC v. ION Geophysical Corp.*, --- U.S. ---, ---, 138 S. Ct. 2129, 2137 (June 22, 2018) (quoting 35 U.S.C. § 284). "Under the statute, 'damages adequate to compensate' means 'full compensation for . . . any damages [the patent owner] suffered as a result of the infringement." *Mentor Graphics Corp. v. EVE-USA, Inc.*, 851 F.3d 1275, 1283 (Fed. Cir. 2017) (alteration in original) (quoting *Gen. Motors Corp. v. Devex Corp.*, 461 U.S. 648, 654–55 (1983)). When a patentee demonstrates a reasonable probability that "it would have made additional sales but for a defendant's infringement, the patentee is entitled to be made whole for the profits it proves it lost." *Sunoco Partners Mktg. & Terminals L.P. v. U.S. Venture, Inc.*, 32 F.4th 1161, 1180 (Fed. Cir. 2022) (quoting *Mentor Graphics Corp.*, 851 F.3d at 1284). "There is no particular required method to prove but for causation," however "[o]ne 'useful, but non-exclusive' method to establish the patentee's entitlement to lost profits is the *Panduit* test first articulated by the Sixth Circuit." *Mentor Graphics Corp.*, 851 F.3d at 1284 (quoting *Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1545 (Fed. Cir. 1995) (en banc) (citing *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152 (6th Cir. 1978))); *see also TEK Glob., S.R.L. v. Sealant Sys. Int'l*, 920 F.3d 777, 789–90 (Fed. Cir. 2019); *Georgetown Rail Equip. Co. v. Holland L.P.*, 867 F.3d 1229, 1241 (Fed. Cir. 2017). "Under the *Panduit* test, a patentee is entitled to lost profit damages if it can establish four things: (1) demand for the patented product; (2) absence of acceptable non-infringing

alternatives; (3) manufacturing and marketing capability to exploit the demand; and (4) the amount of profit it would have made." *Mentor Graphics Corp.*, 851 F.3d at 1285 (citing *Panduit*, 575 F.2d at 1156); *see also Sunoco Partners Mktg. & Terminals L.P.*, 32 F.4th at 1180; *Georgetown Rail Equip. Co.*, 867 F.3d at 1241.

"Damages under *Panduit* are not easy to prove." *Mentor Graphics Corp.*, 851 F.3d at 1285. "The first factor — demand for the patented product — considers demand for the product as a whole." *Id.* (citing *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 567 F.3d 1314, 1330–31 (Fed. Cir. 2009)). "The proper inquiry asks whether demand existed in the marketplace for the patented product, i.e., a product 'covered by the patent in suit or that directly competes with the infringing device.'" *Georgetown Rail Equip. Co.*, 867 F.3d at 1241 (quoting *DePuy Spine, Inc.*, 567 F.3d at 1330). "The second factor — the absence of non-infringing alternatives — considers demand for particular limitations or features of the claimed invention." *Mentor Graphics Corp.*, 851 F.3d at 1285 (citing *DePuy Spine, Inc.*, 567 F.3d at 1331). "To prove the absence of acceptable, non-infringing alternatives, the patentee may prove either that the potential alternative was not acceptable to potential customers or was not available at the time." *Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*, 875 F.3d 1369, 1380 (Fed. Cir. 2017) (citing *Grain Processing Corp. v. Am. Maize-Prod. Co.*, 185 F.3d 1341, 1353–55 (Fed. Cir. 1999)); *Mentor Graphics Corp.*, 851 F.3d at 1286 ("[I]f there is a noninfringing alternative which any given purchaser would have found acceptable and bought, then the patentee cannot obtain lost profits for that particular sale."). "Together, requiring patentees to prove demand for the product as a whole and the absence of non-infringing alternatives ties lost profit damages to specific claim limitations and ensures that damages are commensurate with the value of the patented features." *Mentor Graphics Corp.*, 851 F.3d at 1285. "For sales in which the patentee

cannot prove the elements necessary to establish entitlement to lost profits, the statute guarantees the patentee a reasonable royalty for those sales." *Id.* at 1286. "A reasonable royalty can be calculated from an established royalty, the infringer's profit projections for infringing sales, or a hypothetical negotiation between the patentee and infringer . . . ." *Wordtech Sys., Inc v. Integrated Networks Sols., Inc.*, 609 F.3d 1308, 1319 (Fed. Cir. 2010).

"Section 284 [of the Patent Act] gives district courts the discretion to award enhanced damages against those guilty of patent infringement." *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 579 U.S. 93, 110 (2016). It provides that, "in a case of infringement, courts 'may increase the damages up to three times the amount found or assessed.'" *Id.* at 97 (quoting 35 U.S.C. § 284). "[A]wards of enhanced damages are discretionary, and 'courts should . . . take into account the particular circumstances of each case in deciding whether to award damages, and in what amount.'" *Georgetown Rail Equip. Co.*, 867 F.3d at 1244 (quoting *Halo Elecs., Inc.*, 579 U.S. at 106. "[S]uch punishment should generally be reserved for egregious cases typified by willful misconduct." *Halo Elecs., Inc.*, 579 U.S. at 106; *see also Ironburg Inventions Ltd. v. Valve Corp.*, 64 F.4th 1274, 1300 (Fed. Cir. 2023) ("Enhanced damages are generally only appropriate in egregious cases of misconduct, such as willful, wanton, or malicious behavior[.]" (internal quotation marks omitted)); *Stryker Corp. v. Zimmer, Inc.*, 837 F.3d 1268, 1279 (Fed. Cir. 2016) (quoting *Halo Elecs., Inc.*, 579 U.S. at 106). "[T]he subjective willfulness of a patent infringer, intentional or knowing, may warrant enhanced damages . . . ." *Georgetown Rail Equip. Co.*, 867 F.3d at 1244 (quoting *Halo Elecs., Inc.*, 579 U.S. at 105). "When deciding how much to award in enhanced damages, district courts often apply the non-exclusive factors articulated in *Read Corp. v. Portec, Inc.*, 970 F.2d 816 (Fed. Cir. 1992), *abrogated in part on other grounds by Markman v. Westview Instruments, Inc.*, 517 U.S. 370 (1996)." *Id.* at 1244–45; *WCM Indus.*,

*Inc. v. IPS Corp.*, 721 F. App'x 959, 972 (Fed. Cir. 2018) ("Because a finding of willful infringement does not command the enhancement of damages, the *Read* factors, although not mandatory, do assist the trial court in evaluating the degree of the infringer's culpability and in determining whether to exercise its discretion to award enhanced damages at all, and if so, by how much the damages should be increased.").  The *Read* factors are:

> (1) "whether the infringer deliberately copied the ideas of another";
> (2) "whether the infringer, when he knew of the other's patent
> protection, investigated the scope of the patent and formed a good-
> faith belief that it was invalid or that it was not infringed"; (3) "the
> infringer's behavior as a party to the litigation"; (4) the
> "[d]efendant's size and financial condition"; (5) the "[c]loseness of
> the case"; (6) the "[d]uration of the defendant's misconduct"; (7)
> "[r]emedial action by the defendant"; (8) the "[d]efendant's
> motivation for harm"; and (9) "[w]hether the defendant attempted to
> conceal its misconduct."

*Georgetown Rail Equip. Co.*, 867 F.3d at 1245 n.6 (quoting *Read Corp.*, 970 F.2d at 827); *WCM Indus., Inc.*, 721 F. App'x at 972–73 (listing *Read* factors).  "Although 'the district court is not required to discuss the *Read* factors,' it 'is obligated to explain the basis for the [enhanced damages] award, particularly where the maximum amount is imposed.'"  *Polara Eng'g Inc. v. Campbell Co.*, 894 F.3d 1339, 1355 (Fed. Cir. 2018) (citation omitted) (alteration in original) (first quoting *Presidio Components, Inc.*, 875 F.3d at 1382; and then quoting *Read Corp.*, 970 F.2d at 828); *see also Presidio Components, Inc.*, 875 F.3d at 1382–83 (noting that courts are "not required to discuss the *Read* factors" and "[t]he *Halo* test merely requires . . . court[s] to consider the particular circumstances of the case to determine whether it is egregious").

In the September 2022 Decision, the Court determined that "Plaintiff has offered evidence that Defendants are its 'direct and only competitor' and that there is market demand for let-detection systems among a 'small subset of potential clients' that 'control a closed market comprising virtually the entirety of the professional tennis tournaments.'"  (Sept. 2022 Decision

65.)  In addition, the Court found that "Plaintiff has provided evidence that '[a]ll high level

tournaments [at] the [U.S.] Open require means for let detection'" and that Plaintiff "has the

manufacturing and marketing capability to exploit the demand."  (*Id.* at 65–66 (alterations in

original) (citation omitted).)  The sole issue remaining regarding patent damages involves the

fourth *Panduit* factor: whether Plaintiff has now provided evidence of "the amount of profit it

would have made."  *Mentor Graphics Corp.*, 851 F.3d at 1285 (citing *Panduit*, 575 F.2d at

1156).

### 1.   Lost profits

First, the Court agrees with Plaintiff that in order to calculate lost profits for Plaintiff's

business, the Court must determine Plaintiff's revenue with a reduction for the variable costs.[2]

*See State Indus., Inc. v. Mor-Flo Indus., Inc.*, 883 F.2d 1573, 1579–80 (Fed. Cir. 1989) ("The

district court awarded [plaintiff] its incremental profit . . . reflecting the percentage of sales

revenue [plaintiff] lost because of [defendant's] infringement that would have been its profit.

This approach is well established and appropriate for determining damages for patent

---

[2]  In the September 2022 Decision, the Court concluded that, "[b]ecause Plaintiff did not provide evidence of its fixed costs, the Court is unable to determine the profits Plaintiff would have made."  (Sept. 2022 Decision 66.)  The Court cited *Panduit Corp.*, 575 F.2d at 1156 and *Town & Country Linen Corp. v. Ingenious Designs LLC*, No. 18-CV-5075, 2022 WL 2757643, at *23 n.15 (S.D.N.Y. July 14, 2022) for the proposition that evidence of fixed costs is necessary to calculate lost profits.  Although *Panduit Corp.* remains good law, more recent Federal Circuit cases have indicated that variable or incremental costs are a proper method of measuring profit loss when "any increase in fixed costs [is] minimal."  *State Indus., Inc. v. Mor-Flo Indus., Inc.*, 883 F.2d 1573, 1580 (Fed. Cir. 1989); *see also Stryker Corp. v. Intermedics Orthopedics, Inc.*, 891 F. Supp. 751, 825–26 (E.D.N.Y. 1995), *aff'd*, 96 F.3d 1409 (Fed. Cir. 1996) ("Incremental profits are the difference between gross revenues resulting from regaining the sales lost due to infringement and the incremental cost of making those sales.  This measure of profit loss is appropriate when the patentee's fixed costs do not rise, or only slightly increase, relative to increases in production.").  Because Plaintiff has provided evidence of its costs, and the increase in fixed costs is negligible, the Court uses variable costs to calculate Plaintiff's lost profits.

14

infringement." (citation omitted)); *Paper Converting Mach. Co. v. Magna-Graphics Corp.*, 745 F.2d 11, 22 (Fed. Cir. 1984) ("The incremental income approach to the computation of lost profits is well established in the law relating to patent damages.  The approach recognizes that it does not cost as much to produce unit N + 1 if the first N (or fewer) units produced already have paid the fixed costs.  Thus fixed costs — those costs which do not vary with increases in production, such as management salaries, property taxes, and insurance — are excluded when determining profits." (citation omitted)); *Lam, Inc. v. Johns-Manville Corp.*, 718 F.2d 1056, 1065 (Fed. Cir. 1983) (affirming district court award of lost profits where the district court considered variable costs); *Pentech Int'l, Inc. v. Hayduchok*, 931 F. Supp. 1167, 1173 (S.D.N.Y. 1996) ("The proper method is to subtract both the cost per unit of product and variable costs associated with the manufacture and sale of the unit from the price per unit of product. [Plaintiff] has provided inadequate evidence of its past variable costs."); *Stryker Corp.*, 891 F. Supp. at 825–26.

For the patent damages, Plaintiff claims it lost $60,000 in profit for the 2019 and 2020 U.S. Open events, for a total of $120,000.[3]  (Am. Compl. ¶¶ 14–15; Goldstein Decl. ¶ 24.)  Dr. Goldstein asserts that he was told by the "USTA Chief of Officials in 2015 that a fee of $56,000 was very reasonable," and taking into account improvements in Plaintiff's product and accounting for inflation over the past four to eight years, "$60,000 is a conservative estimate for what [Plaintiff] could have charged USTA."  (Goldstein Decl. ¶ 25.)  In support, Plaintiff provides a leasing proposal to the USTA that indicates a cost of ████████████

---

[3]  Plaintiff previously argued it also lost profits for the 2021 U.S. Open event (Pl.'s Default J. Mem. 28), but the Court's conclusion that Plaintiff's patent infringement claims were successful only applied to the 2019 and 2020 U.S. Open events; these are the only events for which Plaintiff sought relief for its patent infringement claims in the Amended Complaint. (Sept. 2022 Decision 39; Am. Compl. ¶¶ 14–15.)

minimum contract starting in 2019.  (Ex. A, annexed to Goldstein Decl., Docket Entry No. 120-5.)  The Court finds the $60,000 annual figure and $120,000 total over two years as Plaintiff's lost revenue from the patent infringement to be reasonable.

In terms of the costs, Dr. Goldstein asserts that there were "no fixed costs associated with the production of the 16 Grand Slam units" because "manufacturing of [the] product is not taking place at Group One."  (Goldstein Decl. ¶ 30 (emphasis omitted).)  In addition, Dr. Goldstein states that much of the variable costs "were incurred early in development and production over [eight] years ago," the Grand Slam units were produced "virtually without cost," and that the remaining costs are minor such as "labor to assemble and test the units and some parts that are 'off the shelf.'"  (*Id.* ¶¶ 31–32.)  Furthermore, there are "no shipping costs involved," "no set up costs, as the grand slam tournaments pay the entirety of costs for the company personnel to travel to and appear at the tournament to set up and service the equipment," and that "[e]ach lease agreement is concluded without the need for additional warehousing costs or any additional sales representatives."  (*Id.* ¶¶ 33–34.)  Because the product is not sold but leased, Dr. Goldstein argues that "the leasing fee equates to the profit, save for some minor costs that were incurred specifically and solely to produce these [twenty] dedicated units."  (*Id.* ¶ 40.)  In total, Dr. Goldstein states that "specific costs related directly to these grand slam units (e.g., the labor costs for assembly and cost of some off-the-shelf parts) amount to approximately ██████████ ████████████████████████ Grand Slam units.  (*Id.* ¶ 41.)  Finally, Dr. Goldstein states that "each leasing fee would constitute approximately ███████████████████"  (*Id.* ¶ 41.)

The Court finds that the total variable costs for the two U.S. Open tournaments would be ████████████████████████████████████████████████████ *See State Indus., Inc.*, 883 F.2d at 1580 ("There is some testimony that fixed costs might have varied

slightly, but the district court did not abuse its discretion in concluding that any increase in fixed costs was minimal and that award of incremental profits was appropriate.  No greater precision is required.").  The total lost profit for patent infringement is $118,960 ($120,000 less $1,040).  Therefore, the Court awards $118,960 in damages for lost profits due to patent infringement.

### 2.   Enhanced damages

The Court denies Plaintiff's request for enhanced damages.  Enhanced damages awards are discretionary and "are generally reserved for egregious cases of culpable behavior." *Sunoco Partners Mktg. & Terminals L.P.*, 32 F.4th at 1177 (quoting *Halo Elecs., Inc.*, 579 U.S. at 104). The *Read* factors do not support an award of enhanced damages.[4]  Plaintiff has not provided sufficient evidence that Defendants "deliberately copied the[ir] ideas" or failed to "investigate[] the scope of the patent and form[] a good-faith belief that it was invalid or that it was not infringed." *Georgetown Rail Equip. Co.*, 867 F.3d at 1245 n.6 (quoting *Read Corp.*, 970 F.2d at 827); *see also Brooktree Corp. v. Advanced Micro Devices, Inc.*, 977 F.2d 1555, 1582 (Fed. Cir. 1992) (affirming denial of enhanced damages where although there was "sufficient evidence of willfulness to sustain the jury verdict," evidence supporting the jury's finding was "not of the weight and strength that would support the imposition of enhanced damages").  In addition, Defendant Weigel is the CEO, sole employee, and sole owner of GTE, (Am. Compl. ¶ 6), thus, Defendants' "size and financial condition" do not favor enhanced damages, *Georgetown Rail Equipment Co.*, 867 F.3d at 1245 n.6; *c.f. PPC Broadband, Inc. v. Corning Optical Communications RF, LLC*, No. 5:11-CV-761, 2016 WL 6537977, at *7 (N.D.N.Y. Nov. 3, 2016) (enhancing damages where infringing Defendant had "substantial resources" in the form of

---

[4]  The *Read* factors are "nonexclusive, and district courts are not required to discuss them." *Sunoco Partners Mktg. & Terminals L.P.*, 32 F.4th at 1178.

"annual revenues of approximately two billion dollars"); *Johns Hopkins University v. CellPro*, 978 F. Supp. 184, 195 (D. Del. 1997) ("Punishing a larger company in a stronger financial condition may call for higher damages, where a lower number may be equally effective in punishing a smaller company."); *St. Regis Paper Co. v. Winchester Carton Corp.*, 410 F. Supp. 1304, 1309, (D. Mass. 1976) ("[D]ouble damages [are appropriate].  If defendant were the giant and plaintiff the small independent, I would make it treble . . . .").  Although some of the *Read* factors favor an enhanced damages award, such as Defendants' behavior in this litigation where they initially appeared and then defaulted, Defendants have also taken steps to "remed[y]" the situation by returning to the use of the legacy non-infringing Trinity system.  (Sept. 2021 Hearing Tr. 8–9, annexed as Ex. A to Pl.'s 60(b)(1) Mot. for Recons., Docket Entry No. 81-2.) Therefore, the Court declines to award enhanced damages.

### 3.    Price erosion

The Court also declines to modify the lost profits award to account for price erosion. Plaintiff argues that it "could have charged a premium for its equipment if it could have capitalized on the limited monopoly afforded to it under the U.S. patent system."  (Pl.'s Mem. 6.) In support, Plaintiff asserts it could have "charged an additional 15% rather than being forced to underbid Defendants."  (*Id.*)  Plaintiff argues that "[t]his is certainly not a case [with] external downward market pressures" and "with only two suppliers and an increasing emphasis on the need for let detection equipment . . . the demand (and thus price) has tended to increase."  (*Id.*)

Price erosion damages require the "patentee" to "show that, but for the infringement, it would have been able to charge and receive a higher price."  *Vulcan Eng'g Co. v. Fata Aluminium, Inc.*, 278 F.3d 1366, 1377 (Fed. Cir. 2002) (citing *Lam, Inc.*, 718 F.2d at 1065).  "It is not required that the patentee knew that the competing system infringed the patent, if the

patentee reduced its price to meet the infringer's competition." *Id.* (citing *Brooktree Corp.*, 977 F.2d at 1580); *see also Brooktree Corp.*, 977 F.2d at 1580 (finding that price erosion losses, when reasonably related to the infringing activity, may accrue before the infringement has been verified or proved in court). However, the patentee "must establish the amount of price reduction, and that the price was reduced in response to the competing bid." *Vulcan Eng'g Co.*, 278 F.3d at 1377.

Plaintiff provides no evidence that its lost profits from the U.S. Open patent infringement includes price erosion. Plaintiff estimates it could have charged an additional 15%, but provides no evidence in support of this number other than hypothesizing that without Defendants in the market, Plaintiff's limited monopoly would have allowed it to charge higher prices. (Pl.'s Mem. 6.) In *Kalman v. Berlyn Corp.*, 914 F.2d 1473 (Fed. Cir. 1990), the Federal Circuit affirmed a district court's award of an "additional fifteen percent over the sales price for maintenance of depressed prices." *Kalman*, 914 F.2d at 1485. However, in *Kalman*, the district court's determination was supported by the testimony of the plaintiff patent holder who testified that without a competitor in the field, he "would have certainly charged a higher price." *Id.* In this case, there is no testimony establishing that Plaintiff could have charged higher prices to the USTA for the 2019 and 2020 U.S. Open events. The only evidence of price erosion involves Plaintiff's tender offers regarding the French Open and the 2016 Rio Olympics.[5] (Goldstein Decl. ¶¶ 28–29.) Therefore, there is no evidence indicating that Plaintiff's offer to the USTA

---

[5] ████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████

reflected depressed prices. The Court therefore declines to award an adjustment of the patent damages for price erosion.[6]

### ii. Lost profits based on Plaintiff's non-patent claims

In addressing its request for non-patent damages, Plaintiff argues that "[d]amages under the Lanham Act may be based on the infringer's profits." (Pl.'s Mem. 9.) In support, Plaintiff argues that where a "defendant's refusal to participate in discovery prevents the plaintiff from providing precise proof of a defendant's sales and profits, courts may rely on information to estimate profits and award damages that are reasonable, even if imprecise." (*Id.* at 10 (quoting *Study Logic, LLC v. Clear Net Plus, Inc.*, No.11-CV-4343, 2012 U.S. Dist. LEXIS 135847, at *38–39 (E.D.N.Y. Sept. 21, 2012)).)

The Second Circuit has cautioned that "Rule 54(c) provides that '[a] default judgment must not differ in kind from, or exceed in amount, what is demanded in the pleadings.'" *Mickalis Pawn Shop, LLC*, 645 F.3d at 128 n.16 (alteration in original) (quoting Fed. R. Civ. P. 54(c) and citing *Silge v. Merz,* 510 F.3d 157, 161 (2d Cir. 2007)); *see also Est. of Shefner ex rel. Shefner v. Beraudiere*, 582 F. App'x 9, 12 (2d Cir. 2014) (same). The Second Circuit has explained that:

> [T]he defending party should be able to decide on the basis of the relief requested in the original pleading whether to expend the time, effort, and money necessary to defend the action. It would be

---

[6] Although Plaintiff requests "prejudgment and post-judgment interest" in its Amended Complaint, (Am. Compl. 33), Plaintiff makes no arguments in its motion for damages in support of its request for prejudgment and post-judgment interest. The Courts declines to determine what interest, if any, that Plaintiff is entitled to. Accordingly, the Court does not grant any interest to Plaintiff in connection with its award for patent damages. *See In re Palermo*, 739 F.3d 99, 106 (2d Cir. 2014) ("The decision whether to grant prejudgment interest and the rate used if such interest is granted are matters confided to the district court's broad discretion.").

> fundamentally unfair to have the complaint lead defendant to
> believe that only a certain type and dimension of relief was being
> sought and then, should defendant attempt to limit the scope and size
> of the potential judgment by not appearing or otherwise defaulting,
> allow the court to give a different type of relief or a larger damage
> award.

*Silge*, 510 F.3d at 159 (quoting 10 Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane,

*Federal Practice and Procedure,* § 2663 (1998)); *see also Guanghong Int'l (HK) Ltd. v.*

*Ultimate Fin. Sols. LLC*, No. 11-CV-4019, 2012 WL 1228085, at *4 (S.D.N.Y. Mar. 26, 2012)

("[B]ecause the damages sought at the inquest stage differ in kind from those sought in the

complaint, they are not warranted."), *report and recommendation adopted*, No. 11-CV-4019,

2012 WL 2402902 (S.D.N.Y. June 26, 2012); *Finkel v. Triple A Grp., Inc.*, 708 F. Supp. 2d 277,

282–83 (E.D.N.Y. 2010) (adopting report and recommendation) ("Plaintiff 'could easily have

drafted a complaint that included a distinct claim for [certain damages] in the demand clause.  By

operation of Rule 54(c), his failure to do so, intentional or not, ran the risk that his damages

would be limited in the event of default.'" (citations omitted)); *Silge*, 510 F.3d at 160 ("By

limiting damages to what is specified in the 'demand for judgment,' the rule ensures that a

defendant who is considering default can look at the damages clause, satisfy himself that he is

willing to suffer judgment in that amount, and then default without the need to hire a lawyer.").

"[A]lthough Rule 54(c) limits the damages recoverable by a plaintiff following a default

judgment to the type and quantity of damages demanded in the complaint, it does not require

plaintiff to have demanded a sum certain in order to recover on default."  *Micro Fines Recycling*

*Owego LLC v. Ferrex Eng'g, Ltd.*, No. 3:17-CV-1315, 2020 WL 880801, at *6 (N.D.N.Y. Feb.

24, 2020) (internal quotations marks omitted).  "[C]ourts in this jurisdiction have interpreted the

Rule 54(c) requirement to turn on defendant's receipt of adequate notice of the scope of

damages."  *Microban Prods. Co. v. Iskin Inc.*, No. 14-CV-05980, 2016 WL 4411349, at *4

(S.D.N.Y. Feb. 23, 2016) (collecting cases), *report and recommendation adopted*, 2016 WL

4411414 (S.D.N.Y. Aug. 18, 2016).  Because a plaintiff can readily include a distinct claim for

damages in their complaint, "[c]ourts have thus strictly construed the damages provisions of

complaints awarding damages on default."  *Alonso v. New Day Top Trading, Inc.*, No. 18-CV-

4745, 2020 WL 9815184, at *7 (S.D.N.Y. June 29, 2020), *report and recommendation adopted*,

2021 WL 4691320 (S.D.N.Y. Oct. 7, 2021) (collecting cases); *see also Belizaire v. RAV*

*Investigative & Sec. Servs. Ltd.*, 61 F. Supp. 3d 336, 346 (S.D.N.Y. 2014) (same).

In the September 2022 Decision, the Court granted Plaintiff's default judgment with

respect to the claims of tortious interference with prospective business relations, unfair

competition under the New York common law, and false advertising claims under the Lanham

Act.  (Sept. 2022 Decision 74.)  The Court found that "Plaintiff is entitled to a presumption that

Defendants' false advertising caused Plaintiff injury, entitling it to damages."  (*Id.* at 72.)

However, the Court also found that "Plaintiff has not provided all of the information necessary to

allow the Court to calculate Plaintiff's lost profits," because "[P]laintiff does not provide the cost

it would incur in generating revenue — i.e., production costs, shipping charges, and setup costs."

(*Id.* at 73 (alteration in original) (citation omitted).)

In its memorandum of law in support of its motion for default judgment, Plaintiff

requested $300,000 in non-patent damages from lost sales with the non-U.S. Open Grand Slam

events including the 2020 Australian Open, 2020 French Open, 2021 Wimbledon, 2021

Australian Open, and 2021 French Open.  (Pl.'s Mem. in Supp. of Mot. for Default J. 30–31..)

However, none of these tournaments are mentioned in the Amended Complaint.  At most,

Plaintiff refers to "other," "prospective," or "potential" customers, but does not actually name,

identify, or describe the other Grand Slam tournaments that it now seeks damages for.  (*See* Am.

Compl.)  Plaintiff knew who the potential customers were at the time it filed the Complaint and

Amended Complaint, particularly because there are only three other Grand Slam tournaments

and could have readily included them in the Amended Complaint.  *See, e.g., Finkel*, 708 F. Supp.

2d at 282–83 (denying claim for damages where plaintiff "could easily have drafted a complaint

that included a distinct claim for [certain damages] in the demand clause" because "[b]y

operation of Rule 54(c), [plaintiff's] failure to do so, intentional or not, ran the risk that his

damages would be limited in the event of default").  Furthermore, Plaintiff's memorandum in

support of default judgment refers to tournaments occurring in 2021 whereas the Amended

Complaint only mentions the 2019 and 2020 U.S. Open tournaments.  *See New York City Dist.*

*Council of Carpenters Pension Fund v. Quantum Const.*, No. 06-CV-13150, 2008 WL 5159777,

at *4, *11 (S.D.N.Y. Dec. 9, 2008) ("[D]amages should be limited to the time period set forth in

the [c]omplaint.").  Because the Amended Complaint does not identify the potential customers or

tournaments with respect to the non-patent causes of action, the Court finds that Defendants

could not have been on notice of the scope of non-patent damages they could face upon default.

Courts have "strictly construed the damages provisions of complaints awarding damages on

default," *Alonso*, 2020 WL 9815184, at *7, and Plaintiff's failure to clearly identify the

tournaments for which it sought non-patent damages disqualifies its request for non-patent

damages.  *See, e.g.*, *Jowers v. DME Interactive Holdings, Inc.*, No. 00-CV-4753, 2006 WL

1408671, at *9 (S.D.N.Y. May 22, 2006) (declining to award statutory liquidated damages where

"the complaint did not give notice that [plaintiff] was seeking liquidated damages by making a

citation to the applicable provisions of New York's Labor Law"); *Marina B Creation S.A. v. de*

*Maurier*, 685 F. Supp. 910, 912–13 (S.D.N.Y. 1988) (declining to award treble damages

requested in memorandum of law where such damages were not specified in either complaint or

notice of motion for default).

Accordingly, the Court does not award any lost profits based on non-patent damages to Plaintiff.[7]

### c.   Plaintiff's motion to modify the permanent injunction

Plaintiff argues that there has been a change in circumstances because USTA announced that it believes "it is free and clear of any injunction that refers to infringement of the patents" because they do not believe they are infringing.  (Pl.'s Inj. Mem. 5.)  In support, Plaintiff argues that it "did not understand that the Court intended to insert the new phrase 'violates the Asserted Patents' in lieu of the language that focused the injunction on only those tournaments that use the shot clock rule."  (*Id.* at 4.)  Second, Plaintiff argues that its proposed revision is a "reversion" to a narrower injunction and avoids referencing an external document (in this case, the patent).  (*Id.* at 6.)  Third, Plaintiff argues that "past misconduct" justifies reversion to the original proposed language.  (*Id.* at 7–8.)

The Court denies Plaintiff's motion to modify the permanent injunction.  At the September 14, 2022 status conference, the Court stated on the record why it believed Plaintiff's proposed permanent injunction language was too broad: "the only other question I had as to paragraph, what you identify as D of the order, which is, again, including Trinity product, which to me, I understand it to be too broad and the limiting language I'm including after that is that it violates, *that violates the asserted patents, so that there's no confusion as to what the Court is*

---

[7]   Because the Court grants Plaintiff lost profits damages on Plaintiff's patent claims with respect to the 2019 and 2020 U.S. Open tournaments, the Court excludes those tournaments for Plaintiff's non-patent damages to avoid double-counting.  *See Abbott Lab'ys v. Adelphia Supply USA*, No. 15-CV-5826, 2019 WL 5696148, at *51 (E.D.N.Y. Sept. 30, 2019) ("[T]his Circuit's 'one satisfaction rule . . . prohibits a plaintiff from recovering more than one satisfaction for each injury.'" (quoting *Gerber v. MTC Elec. Techs. Co.*, 329 F.3d 297, 303 (2d Cir. 2003))).

*enjoining*.  And with those changes, I will sign the permanent injunction based on the default

decision of the amended complaint."  (Sept. 14, 2022 Tr., annexed to Pl.'s Mot. to Modify

Permanent Inj. ("Tr.") 5:22-6:5, Docket Entry No. 126-3 (emphasis added).)  Plaintiff cannot

now claim that it "did not understand that the Court intended to insert the new phrase 'violates

the Asserted Patents'" when the Court explicitly stated this at the conference.  Even if Plaintiff

misunderstood the Court at the conference, Plaintiff has had multiple opportunities to seek

modification of the permanent injunction.  At the conference, the Court provided Plaintiff's

attorney another opportunity to suggest additional language:

> THE COURT: Okay. So Mr. Davis, as to paragraph 9B, will you
> take a look at that and let me know if you believe additional
> language should be added?
>
> MR. DAVIS: I am looking at it, Your Honor. Your Honor, actually
> that – that's sufficient. I apologize.

(Tr. 11:5–10.)  Furthermore, twenty-four hours after the conference, Plaintiff's attorney

requested to confer with Plaintiff about the language of the permanent injunction.  (Tr. 11:23–

12:2.)  The Court granted this request and did not issue the permanent injunction, (Tr. 12:3–6),

until later that day when Plaintiff submitted a letter stating that Plaintiff "has no objection to or

further comment on the Court's proposed revision to the language," (Pl.'s Letter dated Sept. 14,

2022, Docket Entry No. 112.)  In addition, on September 28, 2022, Plaintiff requested a

correction of the permanent injunction because it contained "an error in paragraph 3" stating that

"Defendants are not liable for false advertising and false representations under Section 43(a) of

the Lanham Act" which was inconsistent with the findings and conclusions in the September

2022 Decision.  (Pl.'s Letter dated Sept. 28, 2022, Docket Entry No. 115.)  On September 29,

2022, the Court made the correction.  (Order dated Sept. 29, 2022, Docket Entry No. 116.)

Therefore, Plaintiff had multiple opportunities to raise any issues with the language of the

permanent injunction, and actually did raise a technical correction which the Court adopted. Over six months have elapsed between the time Plaintiff stated it had no issues with the language of the permanent injunction, and its application to modify the permanent injunction, therefore the Court denies Plaintiff's motion to modify the permanent injunction.

Plaintiff's other arguments in favor of modification are not persuasive.  First, Plaintiff argues that there has been a change in circumstances because USTA announced it believes it is abiding by any injunction that refers to infringement of the patent.  This is not a change in circumstances because the USTA said as much at the September 14 conference:

> MR. MCLAUGHLIN: . . . I've said this to Magistrate Judge Cho, and I'll say it again here, that the USTA doesn't believe it's infringing. So if there's an injunction out there that says don't infringe these patents, you know, we think we're clear of that. So I think that's the USTA's position.

(Tr. 10:24–11:3.)  Because this was prior to the Court's entry of the permanent injunction, Plaintiff cannot reasonably claim that USTA's position represents a "change in circumstances."

Second, Plaintiff argues that its proposed revision is a reversion to a narrower injunction and that it avoids referencing an external document.  The Court disagrees that Plaintiff's proposed revision is "narrower."  As the Court already stated at the September 14 conference, the Court understands the originally proposed language "to be too broad" and the Court included the language "violates the asserted patents" as "limiting language . . . so that there's no confusion as to what the Court is enjoining."  (Tr. 5:24–6:5.)  Plaintiff's proposed language is for the Court to enjoin Defendants from importing any let detection system, including Trinity product, "for use at any tournament that employs a shot clock or observes the shot clock rule."  (Pl.'s Inj. Mem. 7.) However, this language is broader than the permanent injunction's ban on the "importation of any let detection system, including Trinity product, that violates the Asserted Patents," (Order and Permanent Inj. ¶ 9(c)), because Plaintiff's proposed language may prohibit the USTA from

using the legacy Trinity product with the modified third-party shot clock button even though

such product may not violate the patents.

Plaintiff's argument that the current language, unlike its proposed language, references an

external document and therefore violates Rule 65(d) of the Federal Rule of Civil Procedure is

also not persuasive.  Rule 65 states: "Every order granting an injunction and every restraining

order must . . . describe in reasonable detail — and not by referring to the complaint or other

document — the act or acts restrained or required."  Fed. R. Civ. P. 65(d)(1).  Plaintiff argues

that because the permanent injunction references the "asserted patents," that it violates Rule 65

by referring to documents outside of the four corners of the injunction.  Although Plaintiff is

correct that courts should avoid references to external documents in permanent injunctions, *see*

*Capstone Logistics Holdings, Inc. v. Navarrete*, 838 F. App'x 588, 591 (2d Cir. 2020) ("[W]e

conclude that the form of the permanent injunction entered by the District Court fails to satisfy

the specificity requirements of Rule 65(d) because it is 'not possible to ascertain from the four

corners of the order precisely what acts are forbidden' without resorting to extrinsic documents."

(quoting *Corning Inc. v. PicVue Elecs., Ltd.*, 365 F.3d 156, 158 (2d Cir. 2004))), the Court is

unaware of any case law holding that an injunction referencing a particular patent violates Rule

65.  *See, e.g.*, *Capstone Logistics Holdings, Inc.*, 838 F. App'x at 591 (reversing grant of a

permanent injunction where the injunction referred to its own separate findings of fact and

conclusions of law); *Fonar Corp. v. Deccaid Servs., Inc.*, 983 F.2d 427, 430 (2d Cir. 1993)

(reversing grant of a preliminary injunction which referenced the district court's prior order).  In

any event, the Second Circuit has held that where an injunction references extrinsic documents

that the enjoined party is clearly aware of, the injunction does not violate Rule 65(d).  *Perfect Fit*

*Indus., Inc. v. Acme Quilting Co.*, 646 F.2d 800, 809 (2d Cir. 1981) ("Thus, although in other

27

circumstances the district court would have been required by Rule 65(d) to attach photocopies of Exhibits 2 and 3 to its injunctive order, as was done with the form of recall letter to be sent, we will not allow [defendant], whose own suggested language referred to those exhibits, to excuse its noncompliance on the ground that the May 19 order was impermissibly vague."). Defendants are the enjoined party and they are clearly aware of the asserted patents.

Third, Plaintiff argues that USTA's "past misconduct" justifies reversion to the original proposed language. (Pl.'s Inj. Mem. 7–10.) This argument is unavailing because Plaintiff has never shown and the Court has never held that the USTA committed any misconduct. The Court has never adjudicated the issue of whether USTA is in violation of Plaintiff's patents because the USTA is not a party in this matter, as the Court has made clear a number of times.[8] Therefore,

---

[8] Plaintiff and USTA have chosen not to litigate the issue of patent infringement in a traditional suit and have instead attempted to use TROs and injunctive relief as an avenue for litigating the underlying claims. The parties continue to avoid suing each other as the Court referenced at the September 14 conference (Tr. 8:3–7 ("This case, the posture of it, is unusual to say the least. The defendants have defaulted, you've only sought relief against the defendant[s]; but you seek to enjoin the USTA . . . . Why haven't you made them a defendant in this case?"); Tr. 9:2–5 ("And so either way this is going to be litigated at some point down the road with the USTA. And I guess I have a similar question for the USTA, why are you not intervening in this action?"); Tr. 9:20–25 ("So how do the parties plan on proceeding then in view of the fact that neither side wants to involve the other in this litigation? Are we going to be back here a year from now, in August of 2023, where [] plaintiff is going to be asking me to hold you in contempt of this order if it's not resolved some other way?"); Tr. 12:7–12 ("And, so, as you point out, Mr. Davis, I probably can't force you to make the USTA a defendant in this case, but I am going to strongly suggest that you figure out how to resolve this issue with the USTA short of coming back to the Court in August of 2023 seeking to hold them in contempt of court."). Litigating the merits of the underlying patent infringement claim through the use of temporary restraining orders and other injunctive requests is not productive and is not the appropriate way to litigate these issues simply because the parties want to avoid the cost of litigation. (Tr. 8:9–11 ("[M]y client is hesitant to engage in full on litigation with a potential client, particularly a well-funded one such as this."); Tr. 9:8–13 ("From our perspective, it's a matter of cost. We've already had to endure significant attorneys' fees in dealing with — with this issue over the years and the cost of litigation, a full on patent infringement litigation is significant and it's significant to the USTA decision-making process.").) The Court will decline to treat the parties' emergency requests as emergencies since they are all self-created.

the Court denies Plaintiff's motion to modify the permanent injunction.[9]

### III.   Conclusion

For the foregoing reasons, the Court awards Plaintiff $118,960 for lost profits on Plaintiff's patent infringement claims.  The Court denies Plaintiff's motion to modify the permanent injunction.  The parties are directed to confer and propose redactions to this Memorandum and Order and any motion papers related to Plaintiff's submission for damages on or before September 11, 2023.

Dated:  August 28, 2023
        Brooklyn, New York

SO ORDERED:


        /s/ MKB
MARGO K. BRODIE
United States District Judge

---

[9]  Plaintiff is directed to inform the Court whether its motion for prejudgment attachment filed on October 7, 2022 is moot in light of the time that has passed since the 2022 U.S. Open.